The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye! Hear ye! Hear ye! All persons having business before this Honorable Court are admonished to draw near and give their attention, as the Court is now sitting. God save the United States and this Honorable Court. Good morning, ladies and gentlemen. We're ready to hear our argument in the case of Klaassen v. Indiana University. Mr. Bonner. Thank you, Your Honor, and may it please the Court. The District Court made two critical findings. One that vaccinated people can become infected and transmit the virus, and that college-age students have an extremely low risk of any adverse effects of the COVID infection, but failed to recognize the profound legal implications of these two critical findings. First, on page 89A. Before we get to any of this, Mr. Bob, I'm concerned about whether we have a justiciable controversy. When the university moved to dismiss as moot, you gave two responses. One was that the plaintiffs were contesting the masking and testing requirements, and the other was that one student, Ms. Speraza, has deferred enrollment and will return to the university later. I notice your brief just doesn't contest the vaccination and testing requirements. So as a reason for keeping this suit alive, that seems to be out. That leaves the status of Ms. Speraza, and of course, mootness is a question that needs to be resolved at each moment in a case. So what do we know about her current status and plans? She is temporarily taking classes online at the, I think the University of Arizona, but she has deferred coming back to- No, look, counsel, I'm not asking what you personally know. I'm sorry, the question was probably poorly phrased. What is in the record about her status and plans? That it was submitted in response to the motion to dismiss. And nothing current. I think before we proceed, we need to have current information about her status and plans. Does she still plan to attend Indiana University if the vaccination requirement ends? Has she been vaccinated, for example? No. No. No. Look, Mr. Bob, I'm not asking you to testify. I'm asking what is in the record about her status today. Well, obviously nothing, we haven't submitted anything. Right. In that event, we need an affidavit providing her information as of today. Okay? Sure. Are you asking me to have that submitted to the court after argument? Yes. Well, we can't have it during oral argument. Right. Well, I'm just asking what you're asking me to do, Your Honor. Unless we know her status in the record, I think we have to dismiss this lawsuit as moot. So if you want it adjudicated, you need to provide that information. Well, we have argued, Your Honor, that all the other plaintiffs equally have standing. The district court only addressed one of them and didn't need to address the others. And also it is perfectly obvious this is capable of repetition, but it's capable of review as Indiana University has now imposed the same vaccine mandate for the spring semester. The original policy was only applicable to the fall semester. They have now extended that to include the spring semester. So and, Your Honor, we are contesting the entire IU mandate policy, which is multifaceted. And as I say, your brief does not make any argument with respect to testing and masking. You can't say we're contesting it and then completely ignore it in your legal documents. Mr. Baum, I suggest that you not argue with me, that you simply commit to file such an affidavit. Otherwise, this is all pointless. Agreed, Your Honor, that I thought it would be appropriate for me to address the legal issues that you raised. Your Honor, first, a critical factual finding was that vaccines do not prevent infection and transmission of the virus. That was found by the court on page 89 of the appendix, where the court said, quote, both vaccinated and unvaccinated people can still get the virus, end of quote. And, of course, this was recognized by Indiana University by August the 30th of 2021, when they extended the masking requirement that had previously only been imposed on unvaccinated students to include vaccinated students, where they said, quote, this this measure masking vaccinated students would, quote, help prevent the spread of COVID-19, end of quote. And, of course, by August the 30th and specifically August the 6th, the CDC acknowledged that, quote, what the COVID vaccines can't do anymore is prevent transmission. So the profound legal implications of this factual finding are first, that there is no public health justification for the requirement of vaccinating students. Now, we acknowledge that protecting others can be a important state interest and even in certain circumstances, compelling. But if vaccinations do not prevent infection and transmission, then there's no public health justification for the vaccination mandate. Similarly, Jacobson does not apply here because at the time of Jacobson in 1905, vaccines were defined as measures which prevent the spread of a infectious disease. And, of course, Jacobson approved as a part of the police power of the state of the requirement for vaccines. So they were approving a public health measure. And with the established fact by the district court that vaccines do not prevent infection and transmission, then there's no public health justification. And Jacobson does not apply. Mr. Bob, I'm sorry to interrupt you. Can I ask you a question? Of course. We're now about a year into vaccines being administered. Has any court, to your knowledge, anywhere in the United States held that a state or local vaccine mandate violates any provision of the United States Constitution? Well, yes, the Supreme Court itself has held that failure to have religious exemptions or appropriate religious exemptions. Right. First Amendment. How about the due process? How about substantive due process? Perhaps there should have been more more precise or the due process clause. No. And, you know, we were the very first case that brought such a challenge. Those challenges have been very rare and much more specific than ours. And so you're now we do have Supreme Court justices concurring and dissenting in various cases, explaining that Jacobson's a modest decision. You know, there's been a lot of development of constitutional law since Jacobson, et cetera. So we do have opinions of individual justices in certain certain and several of the cases that would elucidate this. But so you have a you have basically an issue of first impression. In other words, and that is, what is the scope of the of the of the rights and the interests that are involved? And does that require rational basis or heightened scrutiny? And what I'm explaining is our position that this is not a public health measure. Public health measure is quintessential Jacobson. All right. And that it is not it doesn't prevent infection and transmission. Indiana University argued that that was the basis of their mandate. That is false. And in fact, the district court held that it was false in terms of the relevant fact. And that is vaccination does not prevent the spread. So what we are left with is the other justification that you get. And that is that it prevents it could prevent. And the evidence seems to suggest that it does serious adverse effects if you get the infection. And of course, that's a preventive medical treatment. I mean, an individual has a right under Kuzan and Luxburg and Biddick and Humphrey and Riggins themselves to have when the government mandates medical treatment, as they did in every single one of those cases, the court imposed heightened scrutiny. They required in those cases a strong, essential, overriding, important state interest to override a medical treatment choice. And and and critically require the government to prove the justification not to, you know, this incredible deference that is given to rational basis review. So that fact changes that fact, that critical fact that a vaccinated person can still be infected. I mean, look, Indiana University's president, fully vaccinated, got COVID. Our health state health director just got a second infection of COVID after being fully vaccinated and boosted. There is simply no doubt. And and in fact, the evidence was sufficient for the district court to find this situation to exist. Now, the second fact is that colleges, college age students have an incredibly low risk of adverse effects for the COVID infection. In fact, the risk of death, the survival rate is ninety nine point nine six percent. It's on page six of the appendix. Note five. And the risk for older people, the oldest cohort of people is eight hundred and seventy times greater than college age students. They are mandating a medical treatment. Absolutely no reason to do so for this group. They do not need the help of a prevented medical treatment or at least they should have the right to choose it. And the I.U. can't justify imposing this with the known and unknown risk where they have virtually no risk of adverse effects. Indiana University with 90,000 students over the last two years has probably had one death of one college student. And we know today that the CDC has explained and acknowledged that seventy five percent of the deaths for COVID is with people with four or more comorbidity. Indiana University students are young, healthy, without comorbidity. There is no justification under heightened scrutiny to require that they be vaccinated in order to prevent serious adverse effects of getting an infection. So we ask that you reverse the court, require them to impose a preliminary injunction or reverse the court. We impose heightened scrutiny and that the I.U. must prove the justification for their mandate and under current circumstances. Thank you. Thank you, Mr. Bob. Mr. Paul. May it please the court. Although COVID-19 is novel, the question before you is not. In 1922, in a case called Zuck versus King, the Supreme Court dismissed a challenge to a public school vaccine mandate for failure to present a substantial question. Quote, Jacobson settled that it is within the police power of a state to provide for compulsory vaccination. Plaintiff's challenge to I.U.'s vaccine policy is no more compelling than was Jacobson's challenge to the vaccine policy at issue in his case. Jacobson invoked the same principles of bodily autonomy and integrity that plaintiffs invoke here. And the Supreme Court ruled that they do not trump the state's authority to require vaccination against a dangerous and highly transmissible disease. Now, as this court did in denying an injunction pending appeal, we assume plaintiffs have a liberty interest in bodily autonomy and integrity. But critically, this is not a fundamental right ingrained in the American legal tradition, at least when it comes to vaccine mandates designed to curb dangerous and highly transmissible diseases. As this court has already noted, vaccine mandates have been common in this country. All 50 states and the District of Columbia require students to obtain certain vaccinations as a condition of attending public school. Even before COVID, Indiana required public university students to obtain vaccination against six other dangerous diseases. Both before Jacobson and since, courts throughout the nation have upheld state vaccine mandates. Indeed, the Jacobson opinion itself favorably cites prior decisions upholding state vaccine mandates in the public school context, including one from Indiana. Now, historically, vaccine mandates have been reviewed only to ensure they are rationally related to a legitimate government purpose. As Justice Gorsuch noted in the recent Roman Catholic diocese case, although Jacobson predated the modern tiers of scrutiny, the Jacobson court essentially applied rational basis review. So the burden is on the plaintiffs to negate every conceivable basis that could support IU's policy. Government policies of this nature are not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data. IU's policy easily clears the low bar of the rational basis test. Mr. Paul, can I ask you a question about the policy? There's a reference in the blue brief on page 28 to what's referred to as an ethical exemption under the policy. What can you tell us about that and what might the record say about it, if it exists? It did exist. What the record says is that it exists, and I think that's about all that the record says about it. Does the public record provide a little bit? Does it exist today as we're speaking? It is being phased out as we speak for the spring semester. The ethical exemption is not defined, nor, by the way, is the religious exemption, and that's because IU does not want to be in the business of investigating sincerity of people's beliefs. So that is the sum and substance of what we know about the ethical exemption. Thank you. Now, as the district court noted, IU considered a vast amount of data in formulating its policy, and that data easily supports the rationality of IU's policy. This was, by any reasonable measure, the product of a deliberative process. Now, let me just say a word about the ever-evolving factual situation on COVID that Mr. Bob references. A district court cannot be at reverse based on facts that weren't before it, but in any event, the more we learn, the more the reasonableness of IU's policy is confirmed. Plaintiffs claim below that the pandemic was effectively over and that we had reached herd immunity. The very fact that in-person arguments in this case were canceled suggests one could reasonably disagree. Indeed, more people died from COVID in 2021 than in 2020. The contested nature of such basic facts and their evolution over time vividly illustrates why federal courts are not well-equipped to second-guess the COVID policy decisions of state and local governments and why such decisions should be reviewed only for rational basis. Equally so, it underscores why federal courts should be especially cautious about imposing the extraordinary remedy of a preliminary injunction. Now, let me address this distinction head-on between public health measures and medical treatments. This isn't an argument that the plaintiffs made below, let alone based on the evidence they now cite, so it's a wave, but beyond that, the case law doesn't draw that line. Under Glucksberg, the question is whether the right at issue is fundamental, and Jacobson and Zook settled that matter. But even accepting that rational basis review applies only to public health measures, IU's policy easily, easily fits the bill. This is what the CDC's website says today, January 11, 2022, about the issue of vaccines and spread. COVID-19 vaccines, quote, can reduce the risk of getting and spreading the virus that causes COVID-19. That from a page that was updated as of January 4th, and there are other pages on the CDC's website that make similar statements. But beyond the spread, it can't be seriously questioned that in the public interest to curb serious illness, hospitalization, and death, which even plaintiffs grudgingly acknowledge the vaccines do, indeed, Jacobson implicitly recognizes that curbing these public health risks also justifies a vaccine mandate. In explaining why the government had acted reasonably in that case, the Jacobson court favorably cited a New York case, noting, quote, the common belief is that the smallpox vaccine has a decided tendency to prevent the spread of this fearful disease, and to render it less dangerous to those who contract it. All of these public health risks, serious illness, hospitalization, and death disrupt the educational process. And we've all read about the effects of hospital overcrowding. Reducing these public health risks have been part of IU's rationale for its policy from day one. See the restart committee recommendations report in the record. Now, let me address plaintiffs' remaining arguments, three of them, all of which fail. First, plaintiffs argue, as you've heard today, that the young are less vulnerable to COVID, and therefore students shouldn't have to get vaccinated. But as the district court noted, IU could reasonably believe that even a low death rate is unacceptable, given the relative safety of the vaccines. At approximately 90,000 students, just a .15% death rate, which is the death rate the plaintiffs' own expert calculated for students, is equal to 135 lives. Moreover, mortality is only part of the equation. Also important is preventing people from becoming seriously ill and having to be hospitalized. IU's population is not a homogeneous group of young healthy adults. There are over 8,500 faculty and staff who are at increased risk from COVID, and that doesn't even account for the at-risk older students. Plaintiffs admit that the vaccines may lessen the severity of the symptoms. That alone justifies IU's policy for young people. Second, plaintiffs argue that people who have had COVID don't need the vaccine. Again, IU could reasonably disagree. The CDC recommends that people who have recovered from COVID get the vaccine, in part because if they don't get the vaccine, they're more likely to get COVID. Dr. Cole-Vehler, who was a member of the Restart Committee, which formulated IU's policy, testified to the same effect. And finally, plaintiffs argue that they shouldn't have to get vaccinated, because not all of the vaccines are fully approved, and we can't yet be certain of their long-term effects. But that just begs the question. Is IU's policy reasonable under the circumstances, given what we do know about the vaccines and their risks? It is. As the district court explained, the vaccines are based on technology that has been studied for decades, and the approval process, though temporary for the vaccines, was incredibly robust. Moreover, the known risks associated with the vaccine are incredibly low. As the district court noted traditionally, any significant negative latent outcomes occur within six weeks after receiving a vaccine. And we just haven't seen anything of particular concern in that regard with the COVID vaccine. So IU could reasonably believe that the potentially enormous benefits of requiring vaccination dwarf the minuscule risks. Unless the court has any further questions, we would respectfully ask the court to affirm. Thank you very much, Mr. Paul. Anything further, Mr. Bopp? Mr. Bopp, you're muted. I'm so sorry. As you heard, IU's position is to seize enormous power over its students who are adult, competent adults, who are entitled to make their own medical treatment decisions. They think that they can seize the power of requiring any medical treatment where they deem the occurrence of death or serious injury among their students doesn't meet their level of acceptability. And, of course, we see how broad that is because when we note that the district court found that the survival rate from a COVID infection for this age group is 99.96%, and there's hardly anything that won't cause death of that rate. There is only one circumstance under the line of cases, Poussin to CELS, that ever approved mandating medical treatment, and that is for prisoners incarcerated in a jail. And they approve psychotropic drugs in order to prevent adverse safety concerns caused by that prisoner's mental health issues. So, Indiana University thinks the law that they can treat students as prisoners and preempt their medical treatment decisions based on, as they argue, speculation about whether or not there is a lawful basis to do that. Heightened scrutiny doesn't prohibit these policies. Thank you, Mr. Bopp. But it does require adjustment. Thank you, Mr. Bopp. Thank you. The court suggests that you get an affidavit on file as quickly as possible. Thank you very much. This case is taken under advisement.